**Nathan NAGATA, Plaintiff,**

v.

**QUEST DIAGNOSTICS INC., a California corporation, John Does 1–20 and Doe Corporations 1–20, Defendants.**

**No. CV 02–00378 DAE LEK.**

United States District Court,
D. Hawai'i.

Feb. 17, 2004.

Wayne M. Sakai, Mary L. Lucasse, Leilani A. DeCourcy, Burke Sakai McPheeters Bordner, Iwanaga & Estes, Honolulu, HI, for Nathan Nagata, plaintiff.

Ward F.N. Fujimoto, Matsul Chung Sumida & Tsuchiyama, Honolulu, HI, Jeffrey M. Thomas, Gordon Murray Tilden, Seattle, WA, for Quest Diagnostics Incorporated, a California corporation, John Does 1–20, Doe Corporations 1–20, defendants.

*ORDER–DENYING DEFENDANT QUEST'S MOTION FOR SUMMARY JUDGMENT (COUNT IV); ORDER DENYING PLAINTIFF'S REQUEST FOR RULE 56(F) CONTINUANCE*

DAVID ALAN EZRA, Chief Judge.

The court heard Defendant Quest Diagnostics Clinical Laboratories, Inc.'s ("Defendant") Motion on January 23, 2004. Mary L. Lucasse, Esq., appeared at the hearing on behalf of Plaintiff Nathan Nagata ("Plaintiff"); Ward F.N. Fujimoto, Esq., appeared at the hearing on behalf of Defendant. After reviewing the motion and the supporting and opposing memoranda, the court DENIES Defendant's Motion for Summary Judgment (Count IV) and DENIES Plaintiff's Request for Rule 56(f) Continuance as moot.

## BACKGROUND

The details of this case are set forth in further detail in the court's Order Granting in Part and Denying in Part Defendant Quest Diagnostic's Motion for Summary Judgment (Statute of Limitations), filed on June 5, 2003. The facts most relevant to the instant order follow. The court will construe the facts of the case in the light most favorable to Plaintiff.

On January 19, 1999, Plaintiff provided a urine sample to his employer, Garden Isle Telecommunications ("Garden Isle"), pursuant to Garden Isle's drug-testing policy. Defendant tested the sample and reported to Garden Isle's Medical Review Officer ("Dr.Lam") that the sample was inconsistent with human urine. Garden Isle subsequently terminated Plaintiff from his job on January 25, 1999.

Plaintiff bargained for his job back from Garden Isle with no success. Plaintiff also requested that his urine sample be retested. Dr. Lam informed Plaintiff that, under Department of Transportation ("DOT") regulations, Plaintiff's sample could not be retested. *See* Defendant Quest Diagnostics Clinical Laboratories, Inc.'s Separate and Concise Statement of Material Facts in Support of Its Motion for Summary Judgment (Count IV), filed June 19, 2003 ("Defendant Quest's Facts"), Ex. G.

On January 10, 2001, Defendant[1] informed Dr. Lam that it "did not measure the creatinine concentration of specimens to at least one decimal place" between January 4, 1999 and February 2, 1999. *See id.*, Ex. H. Consequently, Defendant did not know whether Plaintiff's urine sample actually met the Department of Health and Human Services' criteria for determining whether a specimen was substituted. *Id.* Accordingly, Defendant canceled Plaintiff's test and instructed Dr. Lam to inform Garden Isle that "any personnel action taken with respect to the donor on the basis of the canceled test no longer has a basis in DOT regulations." *Id.*

On January 25, 2001, Plaintiff was notified by mail of Defendant's error and was offered his job back. Plaintiff Nathan Nagata's Separate and Concise Statement of Material Facts in Opposition to Defendant Quest Diagnostics Clinical Laboratories, Inc.'s Motion for Summary Judgment (Count IV), filed July 24, 2003 ("Plaintiff's Facts"), Ex. H.

On May 7, 2002, Plaintiff initiated the instant action, and amended his Complaint on May 20, 2002. On June 5, 2003, the court dismissed all of Plaintiff's claims, except for his claim of Intentional Infliction of Emotional Distress ("IIED"). The court found that Plaintiff's negligence claims that arose out of the testing of Plaintiff's urine sample were barred by the

---

1. Defendant points out that it was erroneously sued as "Quest Diagnostics Incorporated."

statute of limitations set forth in HRS § 657–7. Order issued on June 5, 2003 ("June 5 Order"), at 11. The court also found that Plaintiff's defamation claim was barred by the statute of limitations set forth in HRS § 657–4. June 5 Order, at 14.

The court determined that Plaintiff's IIED claim arose out of Defendant's alleged intentional withholding of information from Plaintiff from when it found out about the error in February of 1999 until it informed Dr. Lam on January 10, 2001. June 5 Order, at 12. Therefore, the court determined that the statute of limitations did not bar Plaintiff's IIED claim, since it did not begin to run until Plaintiff learned of Defendant's alleged tortious act on January 25, 2001. *Id.*

On June 18, 2003, Defendant filed its Motion for Summary Judgment (Count IV) ("Motion"). Plaintiff filed its Opposition to the Motion on July 24, 2003 ("Opposition"), to which Defendant replied on July 31, 2003 ("Reply"). On January 23, 2004, Plaintiff filed a Supplemental Separate and Concise Statement of Material Facts in Opposition To Defendant Quest Diagnostics Clinical Laboratories, Inc.'s Motion for Summary Judgment ("Supplemental Pleading").[2] On January 29, 2004, Defendant filed a Supplemental Reply Memorandum in Support of Its Motion for Summary Judgment ("Supplemental Reply").

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c).

The moving party has the initial burden of "identifying for the court those portions of the materials on file in the case that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support its legal theory. *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 282 (9th Cir.1979). The opposing party can neither stand on its pleadings, nor can it simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv.,* 809 F.2d at 630; Fed.R.Civ.P. 56(e). In a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party. *State Farm Fire & Casualty Co. v. Martin,* 872 F.2d 319, 320 (9th Cir.1989).

## DISCUSSION

■ As a preliminary matter, the court DENIES Plaintiff's request for a Rule 56(f) Continuance. The court already permitted the entry of Plaintiff's Supplemental Pleading at the hearing on January 23, 2004. Plaintiff's Supplemental Pleading contained many of the depositions that Plaintiff had initially requested a Rule 56(f) Continuance to obtain. Therefore, the court finds that Plaintiff's request for a Rule 56(f) is moot.

■ In Hawai'i, the elements of a claim for intentional infliction of emotional distress ("IIED") are:

1) that the conduct allegedly causing the harm was intentional or reckless,

---

**2.** Plaintiff filed his Supplemental Pleading on the morning of the hearing on January 23, 2004. The court, however, denied Defendant's oral request to strike and permitted its entry after hearing Attorney Lucasse's explanation for its late submission. The court gave Defendant a week to respond to Plaintiff's Supplemental Pleading.

2) that the conduct was outrageous, and

3) that the conduct caused

4) extreme emotional distress to another.[3]

*Hac v. Univ. of Hawai'i,* 102 Hawai'i 92, 73 P.3d 46, 60–61 (2003). In the instant case, Defendant argues that "Plaintiff cannot meet his burden of establishing one or more essential elements of his claim for intentional infliction of emotional distress." Motion, at 7. The court will address each element in turn.

## A. Intentional or Reckless Conduct

■ In Hawai'i, a plaintiff must establish "that the act allegedly causing the harm was intentional or reckless," in order to prevail with his IIED claim. *Hac,* 73 P.3d at 60. Plaintiff argues that the "court need only look to the intentionality of Defendant's actions," and contends that "Defendant only claims that it did not intend to cause Plaintiff's emotional distress. That is not the standard." Opposition at 8.

In *Hac,* the court altered the elements of the tort of IIED to more accurately reflect the language in the Second Restatement. *See Hac,* 73 P.3d at 60. In arriving at its decision to reformulate the elements of the tort, the court focused on the fact that likelihood of illness, usually evidenced by bodily injury, should no longer be a required element. *Id.*

■ The court in *Hac* does not, however, specifically address the implications of the addition of the term reckless to the first element. While there are no Hawai'i cases following the *Hac* decision that discuss the effect of the inclusion of the term reckless on an IIED claim, this court has previously articulated a standard similar to

the one in *Hac,* which includes the term reckless. In *Nelsen v. Research Corp. of the University,* the court stated that an IIED claim required that (1) the conduct be intentional or reckless; (2) the conduct be extreme and outrageous; (3) there be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress be severe. 805 F.Supp. 837, 851–52 (D.Haw.1992). In *Nelsen,* the court stated, "[r]ecklessness requires that defendant must know, or have reason to know, the facts which create the risk." *Id.* (citing Restatement, Torts, 2d § 500, comment a). Accordingly, the court holds that the scope of the first element of a claim for IIED is now broadened to include the definition of reckless as articulated in *Nelsen. Id.*

■ In the instant case, Defendant argues that it did not intend to cause Plaintiff to suffer emotional distress. Defendant claims that it did not withhold information from Plaintiff, but rather, it "timely communicated such information when it became obligated to do so." Motion, at 11. Plaintiff argues, however, that Defendant's two-year delay in disclosure represents an intentional concealment of information. Opposition, at 5. In addition, Plaintiff claims that Defendant was aware of the consequences which followed its report of test results, yet disregarded the affect that its failure to disclose would have on the person whose test results could not be validated. *Id.*

The court finds that issues of material fact exist as to whether Defendant intended to cause or recklessly caused Plaintiff to suffer emotional distress. Defendant began fulfilling its requirement to analyze

---

**3.** Previous to the Hawai'i Supreme Court's *Hac* decision, Hawai'i required the following elements in an IIED claim:

(1) that the act allegedly causing the harm was intentional; (2) that the act was unrea-

sonable; and (3) that the actor should have recognized that the act was likely to result in illness.

*Dunlea v. Dappen,* 83 Hawai'i 28, 924 P.2d 196, 206 (1996).

creatinine concentration to one decimal place in February 1999, but did not inform Dr. Lam of this until January 2001. While Defendant may not have known Plaintiff's identity beyond his sample's control number, reasonable jurors could find that Defendant knew that the person whose control number they had could be negatively impacted as a result of its delay in disclosure. A jury could find that Defendant had reason to know that there was a high degree of risk that its delay in disclosure would cause serious harm to Plaintiff, and that they disregarded that risk. Accordingly, a reasonable jury could find that Defendant's conduct was intentional or reckless, thereby satisfying the first element of Plaintiff's IIED claim.[4]

### B. *Outrageous Conduct*

In Hawai'i, a plaintiff must establish that the defendant's alleged conduct was "outrageous," as defined by the Restatement (Second) of Torts, in order to prevail with his IIED claim. *Hac*, 73 P.3d at 60; *Shoppe v. Gucci America, Inc.*, 94 Hawai'i 368, 14 P.3d 1049, 1068 (2000). The Restatement provides:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in char-

acter; and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46, cmt. d (1965). "The question whether the actions of the alleged tortfeasor are . . . outrageous is for the court in the first instance, although where reasonable persons may differ on that question it should be left to the jury." *Shoppe*, 14 P.3d at 1068.

Defendant argues that, as a matter of law, its alleged conduct is not "outrageous" enough to support a claim for IIED. Motion at 8. Defendant contends that, pursuant to DOT regulations at the time, Plaintiff's urine sample could not be retested once it had been deemed "substituted." *Id.* at 10–11. Additionally, Defendant argues that "Plaintiff made no inquiry with Defendant QDCL and therefore cannot establish any outrageous, intolerable or indecent conduct on the part of QDCL in responding or failing to respond to such an inquiry." *Id.* at 11.

In Hawai'i, courts have generally been reluctant to define conduct as outrageous. *See Shoppe*, 14 P.3d at 1068 (where the court found that abusive verbal attacks by an employer directed at an employee did not rise to the level of outrageous conduct as a matter of law); *Keiter v. Penn Mutual Ins. Co.*, 900 F.Supp. 1339 (D.Haw.1995) (where the court found that the defendant's conduct which resulted in a signifi-

---

4. In Plaintiff's Supplemental Pleading, they claim that Plaintiff's sample could have been designated as positive and that it could have been retested. Supplemental Pleading, at 2–3. The court finds these arguments irrelevant, however, given that Plaintiff's claim for IIED is based on Defendant's failure to report

the changes in its testing policy to Dr. Lam in a timely manner. In its June 5 Order, the court found that Plaintiff's claims relating to the testing of Plaintiff's sample were barred by the statute of limitations. June 5 Order, at 11.

cant increase in the premium payment on plaintiffs' life insurance policy was not outrageous conduct as a matter of law); and *Lapinad v. Pacific Oldsmobile–GMC, Inc.,* 679 F.Supp. 991, 996 (D.Haw.1988) (where the court stated that an employer must have engaged in conduct beyond merely firing an employee for unfair reasons in order for the conduct to possibly be considered outrageous).

The court has found, however, that sexually harassing behavior, racial slurs, and accusations of criminal conduct could all possibly be considered outrageous conduct. *See Lapinad,* 679 F.Supp. at 996. In addition, in *Kalawe v. KFC Nat. Mgmt. & Co.,* the court found outrageous behavior may exist where a plaintiff claimed her supervisor used plaintiff's work injury as a pretext for wrongfully discharging her in retaliation and response to a personal dislike for her. Civ. No. 90–00779, 1991 WL 338566 at *5 (D.Haw. July 16, 1991).

■ The court finds that issues of material fact exist as to whether Defendant's delay in disclosure rose to the level of outrageous conduct. Construing the evidence in the light most favorable to Plaintiff, the court determines that a reasonable juror could find that Defendant's failure to provide information about Plaintiff's urine test to Plaintiff in a timely manner, which resulted in him losing his job for two years and allegedly caused Plaintiff's depression, is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See* Restatement (Second) of Torts § 46, cmt. d. Accordingly, material facts exist as to whether Defendant's conduct was outrageous.

### C. *Causation*

■ In order to pursue his IIED claim, Plaintiff must prove that Defendant's intentional conduct "must have actually caused the plaintiff to suffer severe emotional distress." *Hac,* 73 P.3d at 59. Plaintiff alleges that he suffered the following injuries: contemplation of suicide, depression, substance abuse, shame, and confusion. *See* Plaintiff's Facts, Ex. F, at 17. Plaintiff states that these symptoms arose after he lost his job, which resulted from Defendant's inaccurate report that his urine specimen had been substituted. *See* Defendant Quest's Facts, Ex. E, at No. 3.

Defendant argues that "[t]here is no evidence that any subsequent withholding of information by Defendant QDCL legally caused emotional distress to Plaintiff." Motion, at 12. Furthermore, Defendant argues that evidence presented by Plaintiff "actually confirms that Plaintiff's emotional distress resulted from other causes." Reply, at 8–10. Specifically, Defendant provides evidence that Plaintiff's drug use and long-standing depression were the sources of the extreme emotional distress Plaintiff alleges he suffered as a result of Defendant's conduct. *Id.*

■ Although the evidence presented by Defendant may support its position about causation, they do not, as a matter of law, establish that position. To the contrary, the court finds that genuine issues of material fact exist as to whether Defendant's alleged withholding of the information caused Plaintiff's emotional distress. Plaintiff's January 12, 2001 psychiatric evaluation states, "[a]lthough these symptoms could be situational and drug-related they seem to be long-standing and somewhat independent of drug use." *See* Plaintiff's Facts, Ex. F, at 19. Although Plaintiff's alleged emotional distress arose after he lost his job, the evidence, when construed in the light most favorable to Plaintiff, could suggest that Defendant's subsequent withholding of the information caused Plaintiff to remain unemployed and

to therefore continue suffering emotional distress. Specifically, the evidence suggests that during his period of unemployment, Plaintiff suffered from "depressed mood, anhedonia, feelings of guilt and worthlessness, hypersomnia, low energy and motivation," but that after Garden Isle offered him his job back, he felt "great relief and a renewed desire to move forward ... that the lifting of the shame he carried is gone." *See id.*, Ex. F, at 17–18, Ex. G. Thus, the court finds that the evidence could establish that Plaintiff's emotional distress, which may have been triggered by the loss of his job, continued as a result of Defendant's alleged withholding of information from him.

### D. *Extreme Emotional Distress*

■■■■ "[M]ental distress may be found where a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Shoppe*, 14 P.3d at 1068. The Hawai'i Supreme Court recently recognized that "the likelihood of illness is no longer a necessary element of the tort," and defined "severe emotional distress" as " 'mental suffering, mental anguish, mental or nervous shock and including all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea." *Hac*, 73 P.3d at 59. Defendant argues that Plaintiff does not allege any severe emotional distress, but "asserts only that [he] suffered from depression, shame and confusion, became withdrawn, had no self-esteem and lost trust in people." Motion, at 13.

■■■ At the summary judgment stage, the court construes the facts in the light most favorable to Plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, accepting as true Plaintiff's claim that he contemplated suicide and suffered from depression, substance abuse, shame, and confusion, the court concludes that a trier of fact could find that Plaintiff suffered "mental suffering, mental anguish, mental or nervous shock and including all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea," all of which the Hawai'i Supreme Court recognizes as symptoms of severe emotional distress. *Hac*, 73 P.3d at 59.

### CONCLUSION

Given that genuine issues of material fact exists as to every element of Plaintiff's claim of intentional infliction of emotional distress, the court DENIES Defendant's Motion for Summary Judgment (Count IV), and DENIES Plaintiff's Request for Rule 56(f) Continuance as moot.

IT IS SO ORDERED.